T.C. Memo. 1996-166

UNITED STATES TAX COURT

DERRIL O. LAMB, JR. AND JOYCE LAMB, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17253-94.                    Filed April 1, 1996.

<u>Thomas J. Van Meer</u> and <u>D. Kelley Young</u>, for petitioners.

<u>Paul Colleran</u> and <u>David N. Brodsky</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:   Respondent determined deficiencies in petitioners' Federal income taxes and accuracy-related penalties as follows:

|  |  | Accuracy-Related Penalty |
| Year | Deficiency | Sec. 6662(a) |

| 1990 | $9,560 | $1,288 |
| 1991 | 6,561 | 878 |

The issues for decision are: (1) Whether petitioner Derril O. Lamb's tuna fishing activity was engaged in for profit within the meaning of section 183;[1] and, if not, (2) whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a) for negligence or substantial disregard of rules or regulations.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Bowdoinham, Maine, at the time they filed their petition.

## Mr. Lamb's Tuna Fishing Activity

Petitioner Derril Lamb was born in 1925. Mr. Lamb began harpooning tuna in 1958 when he constructed his own fishing boat and learned how to harpoon from the most successful and experienced fishermen on Bailey Island in Maine. From 1958 through 1960, Mr. Lamb harpooned 4, 8, and 16 tuna, respectively. Beginning in 1961 and continuing for a number of years

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

thereafter, Mr. Lamb harpooned approximately 50 tuna per year. From 1958 through 1982, Mr. Lamb also built and sold one or two fishing boats per year.

In 1982, Mr. Lamb was diagnosed with diabetes. Due to a decline in his health, Mr. Lamb sold his fishing boat and also stopped building fishing boats. In 1986, Mr. Lamb suffered a major heart attack, which left him hospitalized for 2 weeks.

From 1983 through 1987, Mr. Lamb would go out on boats owned by young fishermen, who sought to learn from Mr. Lamb the skill of harpooning tuna. Mr. Lamb did not receive any compensation for his services, nor did he claim any deductions for expenses from these activities on his Federal income tax returns for these years.

During this same time, the price of Atlantic bluefin tuna was rising significantly. The increase was largely attributable to the increased demand for fresh bluefin tuna from Japan, a principal consumer of U.S. Atlantic bluefin tuna.[2]

Due to this significant increase in tuna prices, on January 6, 1988, Mr. Lamb purchased the Lu-Joy, a 35-foot, 300-horsepower diesel fiberglass vessel, which was originally built in 1986 as a lobster boat. After purchasing the Lu-Joy, Mr. Lamb had it

---

[2]To illustrate, the price of Atlantic bluefin tuna was approximately 20 cents per pound during the early 1970's. By 1993, the average price for Atlantic bluefin tuna in the United States was $10.10 per pound, and, in 1994, the price rose to nearly $11 per pound.

rigged specifically for harpooning tuna.  Mr. Lamb obtained the funds for this purchase in the form of a personal advance from Marriner Lumber Co.  Based upon his years of tuna fishing experience, Mr. Lamb believed that he would be able to make a substantial profit in the rising market.

On June 10, 1988, Mr. Lamb obtained a Federal Fisheries permit, which allowed him to harpoon Atlantic bluefin tuna.  This permit allowed Mr. Lamb to harpoon an unlimited number of tuna per day until a total of 50 tons was caught by the tuna fishing community.

The tuna fishing season begins in mid-June and ends in late September.  From June 1 through July 2, 1989, Mr. Lamb was in Africa on a big game hunt.  When he returned to Maine on July 3, the quota for tuna had already been filled.  This was the first time that the quota had been filled so early.  Therefore, Mr. Lamb was unable to do any tuna fishing for the remainder of the season.  Mr. Lamb did not report any income or claim any deductions for his tuna fishing activity on his Federal income tax return for 1989.  Mr. Lamb's accountant, Gerald P. Nadeau, informed Mr. Lamb that he was entitled to a depreciation deduction for the Lu-Joy for 1989, but Mr. Lamb refused because of his failure to do any fishing for that year.

In an attempt to eliminate the quota problem he encountered in 1989, on June 7, 1990, Mr. Lamb changed his Federal Fisheries permit for Atlantic bluefin tuna to the "general category".  This

new permit allowed Mr. Lamb to catch one tuna per day until 350 tons were caught by the community.

The tuna fishing season in Maine typically begins on June 15 and ends on September 30. However, generally there are only 15 to 20 days per season when the weather and sea conditions are appropriate for harpooning tuna. During the 1990 season, Mr. Lamb fished on 15 days; in 1991, he fished on 12 days. Mr. Lamb was accompanied on his fishing trips by a mate who steered the Lu-Joy and performed various other duties. The mate's compensation consisted of a one-third share of any fish caught by the boat. In 1990, Mr. Lamb harpooned one tuna weighing 294 pounds and sold it for $1,250. Mr. Lamb did not catch any tuna in 1991.

Tuna harpooned by Mr. Lamb in prior years generally ranged from 175 pounds to 980 pounds in weight and averaged around 450 pounds. The price per pound for bluefin tuna is generally dependent upon the fat content of the fish.

During 1990 and 1991, Mr. Lamb maintained a log with corresponding entries for each day that he fished and loran coordinates for areas where Mr. Lamb spotted tuna in order to assist him later in returning to good fishing locations. Mr. Lamb also maintained a separate bank account for his tuna fishing activity.

In 1990 and 1991, Mr. Lamb's health began to deteriorate and his diabetes was affecting his eyesight, which, in turn, affected

his harpooning skills.  Mr. Lamb has received three laser treatments on his left eye and two laser treatments on his right eye in the hope of slowing the progression of diabetic retinopathy.

For the taxable years 1988 through 1993, the following gross receipts, expenses, and losses from Mr. Lamb's tuna fishing activity are reflected on Schedule C of petitioners' Federal income tax returns:

| Year | Gross Receipts | Depreciation Deductions | Other Expenses | Losses |
|------|------|------|------|------|
| 1988 | $2,460 | $15,709 | $8,293 | [1]$22,349 |
| 1989 | [2] | [2] | [2] | [2] |
| 1990 | 1,025 | 20,239 | 2,649 | 21,863 |
| 1991 | -- | 14,156 | 897 | 15,053 |
| 1992 | -- | 10,111 | 1,080 | 11,191 |
| 1993 | -- | 10,204 | 1,008 | 11,212 |
| Total | $3,485 | $70,419 | $13,927 | $81,668 |

[1]The total loss figure is slightly greater than the total of its components.  This discrepancy is unexplained.
[2]No Schedule C was attached to petitioners' 1989 Federal income tax return.

Mr. Lamb did not conduct any commercial tuna fishing after 1993. Petitioners did not report Mr. Lamb's tuna fishing as a business activity on their 1994 income tax return.

## Mr. Lamb's Other Business Ventures

On August 5, 1965, Mr. Lamb incorporated Marriner Lumber Co. (Marriner Lumber) in Brunswick, Maine.  Marriner Lumber's

business activity includes the manufacture and retail sale of lumber and building products. On December 31, 1986, Marriner Lumber made an election to be taxed as a "small business corporation" (S corporation) under section 1366. In 1990 and 1991, Marriner Lumber had approximately 50 employees and gross receipts of $5,244,932 and $4,491,418, respectively. During this same time, Mr. Lamb was president of Marriner Lumber and owned 50.6670 percent of its outstanding stock. Neil Lamb, Mr. Lamb's son, owned the remaining stock outstanding. Mr. Lamb worked at Marriner Lumber approximately 15 to 20 hours per week during 1990 and 1991 and received an annual salary of $31,772. For the taxable years 1990 and 1991, Mr. Lamb's shares of the subchapter S profits from Marriner Lumber were $23,831 and $25,610, respectively.

In 1989, Mr. Lamb acquired the Oregon Bow Co. (Oregon Bow) in Junction City, Oregon. During 1990, Mr. Lamb spent 4 weeks actually working in Oregon. The remainder of his work for Oregon Bow was conducted by telephone from Maine. Mr. Lamb received a salary from Oregon Bow of $21,302.16 for 1990.

On March 26, 1990, Mr. Lamb incorporated Marriner Lumber Home Centers, Inc. (MLHC), in Brunswick, Maine. On the same date, MLHC elected to be taxed as an S corporation. MLHC's business activity involves the retail sale of lumber and other building products. During 1990 and 1991, Mr. Lamb was president of MLHC, owned 75 percent of its stock outstanding, and devoted

20 to 25 hours per week to the business during the summer months. Neil Lamb owned the remaining stock outstanding. MLHC had gross receipts in 1990 and 1991 of $3,387,549 and $4,231,685, respectively. In 1990, Mr. Lamb had a nonpassive loss from MLHC in the amount of $3,132; in 1991, his share of the subchapter S profits was $34,396.

During 1990 and 1991, Mr. Lamb held a 50-percent interest in the profits, losses, and capital of the D and N Partnership (D and N), in Brunswick, Maine. D and N reported losses in 1990 and 1991 of $8,554 and $2,957, respectively. In addition, Mr. Lamb had a 50-percent interest during 1990 in the profits, losses, and capital of the GLS Partnership (GLS) in Brunswick, Maine. GLS had income for the year of $60,655.

## OPINION

The primary issue for decision is whether Mr. Lamb's tuna fishing activity was an activity that was "not engaged in for profit" within the meaning of section 183(c). Section 183(a) provides generally that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed, except as otherwise provided in section 183(b).[3]

---

[3]Sec. 183(b)(1) permits a deduction for expenses that are otherwise deductible without regard to whether or not the activity is engaged in for profit, such as interest and personal property taxes. Sec. 183(b)(2) permits a deduction for expenses that would be deductible only if the activity were engaged in for
(continued...)

Section 183(c) defines an activity not in engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowed under section 162 for the ordinary and necessary expenses of carrying on an activity that constitutes the taxpayer's trade or business.  Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.  With respect to either section, however, the taxpayer must demonstrate a profit objective for the activities in order to deduct associated expenses.  Jasionowski v. Commissioner, 66 T.C. 312, 320-322 (1976); sec. 1.183-2(a), Income Tax Regs.  The profit standards applicable to section 212 are the same as those used in section 162.  See Agro Science Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), affg. T.C. Memo. 1989-687; Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Rand v. Commissioner, 34 T.C. 1146, 1149 (1960).

---

[3](...continued)
profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed by sec. 183(b)(1).

Whether the required profit objective exists is to be determined on the basis of all the facts and circumstances of each case. Hirsch v. Commissioner, 315 F.2d 731, 737 (9th Cir. 1963), affg. T.C. Memo. 1961-256; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. While the focus of the test is on the subjective intention of the taxpayer, greater weight is given to the objective facts than to the taxpayer's mere statement of his or her intent. Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. T.C. Memo. 1984-472; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving that they possessed the requisite intention and that respondent's determination that an activity was not engaged in for profit is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933)

Section 1.183-2(b), Income Tax Regs., sets forth some relevant factors for determining whether an activity is engaged in for profit. No one factor is controlling. Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Golanty v. Commissioner, supra at 426. The relevant factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in

carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.

(1)  <u>Manner in Which the Taxpayer Carries on the Activity</u>

Respondent argues that Mr. Lamb did not maintain adequate books and records for his tuna fishing activity.  We disagree.  Mr. Lamb established a separate bank account (the <u>Lu-Joy</u> account) at Casco Northern Bank in Bowdoinham, Maine, which enabled him to segregate the income and expenses from his tuna fishing activity.[4]  In addition, Mr. Lamb maintained a log recording the weather and tide conditions on the days that he fished, as well as the loran coordinates of each tuna that Mr. Lamb spotted so that he could return to that location in the future to fish for tuna.

Respondent also contends that Mr. Lamb did not conduct his tuna fishing activity in a businesslike manner, because Mr. Lamb

---

[4]We note that respondent has not argued that Mr. Lamb has failed to substantiate the amount and nature of any of the expenses he claimed in connection with his tuna fishing activity.

did not participate in the 1989 tuna fishing season.  We
disagree.  The tuna fishing season in Maine begins around June 15
and concludes around September 30; however, the season can be
shortened if the quota of tuna is caught prior to the traditional
end of the season.  Mr. Lamb traveled to Africa on June 1, 1989.
When he returned to Maine on July 3, 1989, the quota of tuna for
Mr. Lamb's permit had already been filled, thereby precluding him
from doing any fishing during the remainder of 1989.

Mr. Lamb testified at trial that July 4 is traditionally
regarded as the date when the Maine tuna fishing season begins in
earnest and that the quota had never been filled this early
before, nor has it since.  We conclude that this is a reasonable
explanation for Mr. Lamb's failure to do any fishing during
1989.[5]  We also note that Mr. Lamb took steps to change his
fishing permit so that he could avoid this problem in future
years.

(2)  The Expertise of the Taxpayer or His Advisers

Mr. Lamb learned how to harpoon tuna in 1958 from
experienced fishermen on Bailey Island in Maine.  He successfully
harpooned tuna and built fishing boats until 1982.  Mr. Lamb is
obviously an individual with substantial experience and expertise

---

[5]We note, too, that since he did no fishing in 1989, Mr.
Lamb refused the advice of his accountant, who advised Mr. Lamb
that he was still entitled to take a depreciation deduction for
the Lu-Joy.

in the tuna fishing business. Between 1983 and 1987, Mr. Lamb was not engaged in the business of fishing but continued to go out on the sea with young fishermen who sought to learn from Mr. Lamb the skill of harpooning tuna. In 1988, rising tuna prices enticed Mr. Lamb to purchase the Lu-Joy and return to the sea to harpoon tuna.

(3) Time and Effort Expended by the Taxpayer in Carrying on the Activity

On brief, respondent points out that Mr. Lamb's log indicates that he made only 15 and 12 fishing trips in 1990 and 1991, respectively. However, Mr. Lamb testified that although the tuna fishing season in Maine typically runs from June 15 through September 30, there are usually only 15 to 20 days per season when the weather conditions are such that it would be worthwhile to go out on the sea to harpoon tuna. As Mr. Lamb testified: "The rest of the time you could go for a boat ride, you could go hope you could see a fish jump, [but] you wouldn't have a ghost of a chance of catching a fish, and I just wouldn't go those days."

(4) Expectation That Assets Used in the Activity May Appreciate in Value

There is no evidence in the record that Mr. Lamb held the Lu-Joy with any expectation that it would appreciate in value.

(5)  The Success of the Taxpayer in Carrying on Other
Similar or Dissimilar Activities

The record reveals that Mr. Lamb has been quite successful in the lumber and building supply business.  Marriner Lumber had gross receipts of $5,244,932 and $4,491,418 in 1990 and 1991, respectively.  In addition, MLHC acquired two building supply stores in 1990 for $1,500,000 and had gross receipts of $3,387,549 and $4,231,685 in 1990 and 1991, respectively.  Mr. Lamb and his son hold all the stock outstanding in these two companies.

During 1990 and 1991, Mr. Lamb also held a 50-percent interest in the D and N Partnership.  However, D and N had a loss of $8,554 in 1990 and $2,957 in 1991.  In addition, in 1990, Mr. Lamb owned a 50-percent interest in the GLS Partnership.  GLS had income for the year of $60,655.

(6)  The Taxpayer's History of Income and Losses With Respect to the Activity, and (7) the Amount of Occasional Profits, if any, Which Are Earned

Mr. Lamb reentered the tuna fishing business in 1988, and this activity generated the following losses:

| Year | Loss |
|------|------|
| 1988 | $22,349 |
| 1989[1] | -- |
| 1990 | 21,863 |
| 1991 | 15,053 |
| 1992 | 11,191 |
| 1993 | 11,212 |
| Total | $81,668 |

[1]Mr. Lamb did not conduct any commercial fishing activity during 1989 or after 1993.

A record of substantial losses over several years is generally indicative of the absence of a profit objective. Golanty v. Commissioner, 72 T.C. at 426.  The record indicates that Mr. Lamb purchased the Lu-Joy and reentered the tuna fishing business in 1988 with the belief that he "was going to make a killing", given the rising prices for tuna.  The record also clearly indicates that Mr. Lamb was an accomplished fisherman with many years of experience.  We do not believe that a fisherman with Mr. Lamb's expertise would have caught only one fish in 2 years if he had been healthy.  Unfortunately, Mr. Lamb's eyesight, which is obviously so vital to a harpoon

fisherman's success on the sea, deteriorated due to his diabetic retinopathy.

(8)  The Financial Status of the Taxpayer

The regulations provide that "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved."  Sec. 1.183-2(b)(8), Income Tax Regs.  On their 1990 Federal income tax return, petitioners reported wages from Marriner Lumber and Oregon Bow totaling $53,074, interest income of $29,653, dividend income of $686, capital gains of $64,583, and miscellaneous income of $4,539.  On their 1991 return, petitioners reported wages from Marriner Lumber of $31,772, interest income of $29,454, dividend income of $557, taxable refunds of State and local income taxes totaling $1,708, capital gains of $23,398, Schedule E income of $44,633, and miscellaneous income of $5,331.  Petitioners clearly received a tax benefit from the losses generated by Mr. Lamb's tuna fishing activity.

(9)  The Presence of Elements of Personal Pleasure or Recreation

The "fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity

to be classified as not engaged in for profit". Sec. 1.183-2(b)(9), Income Tax Regs. Congress did not require that taxpayers dislike an activity as a prerequisite to a finding that they are engaged in the activity for profit. Crail v. Commissioner, T.C. Memo. 1993-40. The Lu-Joy was equipped as a commercial fishing boat, and Mr. Lamb did not use the Lu-Joy for recreational purposes. We believe that Mr. Lamb was a fisherman whose purpose was to earn money from the sale of tuna.

Based on a consideration of all the above factors and having heard Mr. Lamb's testimony at trial, we believe that his primary objective for engaging in fishing activity during 1990 and 1991, was to make a profit. Takahashi v. Commissioner, 87 T.C. 126, 132 (1986); Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Allen v. Commissioner, 72 T.C. at 33; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Jasionownski v. Commissioner, 66 T.C. at 319. Rising tuna prices enticed Mr. Lamb to purchase the Lu-Joy and reenter the tuna fishing business in 1988. We find Mr. Lamb's testimony that he thought he "was going to make a killing" credible. Unfortunately, Mr. Lamb's eyesight deteriorated due to his diabetic retinopathy.[6]

_____

[6]At trial, Mr. Lamb testified that "I'd come in and talk with some of the other fishermen on the dock at night and they had seen fish, a school of fish here and a school of fish

(continued...)

We find that Mr. Lamb's tuna fishing activity was an activity engaged in for profit within the meaning of section 183(c). Petitioners' deduction of the losses associated with this activity is, therefore, not subject to the limitations imposed by section 183(b). It follows that the penalty provisions of section 6662(a) do not apply.

<u>Decision will be entered for petitioners</u>.

---

[6](...continued)
there[,] and I hadn't seen any fish."